IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

DAVID ANTHONY PEARSON, JR.,

                         Plaintiff,

  v.                                                     OPINION and ORDER

CAPTAIN JIM VERSE,                                 22-cv-409-jdp

                         Defendant.

---

Plaintiff David Anthony Pearson, Jr., was a pretrial detainee in the La Crosse County Jail. Defendant Captain Jim Verse was the official in charge of the jail. Pearson alleges that Verse put him in disciplinary confinement for 70 days in a cell with an unsanitary mattress and prevented him from leaving the cell to exercise. Pearson also alleges that his diet was nutritionally inadequate and violated his Rastafarian religious beliefs. I allowed Pearson to proceed on due process claims and claims under the First Amendment and the Religious Land Use and Institutionalized Persons Act (RLUIPA).

Verse moves for summary judgment. Dkt. 52. The evidence does not support Pearson's due process claims about the sanitation of his cell, and the length of that confinement was not so long as to be unconstitutional. The evidence shows that Verse made a diligent effort to provide Pearson with a Rastafarian diet, and that deviations from that diet were not his fault. I will grant Verse's motion and dismiss the case.

## UNDISPUTED FACTS

I begin with a word about the summary judgment evidence. The court affords unrepresented litigants some leeway, recognizing that their submissions usually lack the

formality and polish of the work of a lawyer. But all litigants must comply with the court's orders and rules. At summary judgment, this court requires the moving party, here defendant Verse, to set out a statement of proposed facts with citations to admissible supporting evidence. See the attachment to Dkt. 15. The party opposing the motion, here Pearson, must state whether each fact is disputed, and if it is, support the opposition with a citation to admissible evidence. Pearson objected to many of Verse's proposed facts as irrelevant, or because Pearson didn't know whether the fact was true, or with an argument about the meaning or importance of the fact. None of these objections raise a genuine dispute of fact, and thus the court will deem most of Verse's facts to be undisputed.

The court has reviewed Pearson's deposition, Dkt. 55, which Verse properly uses to support some of his proposed facts. The court will consider Pearson's testimony where it helps clarify Pearson's positions. But the court will not consider Pearson's deposition testimony to create a dispute of fact where Pearson has not properly disputed one of Verse's proposed facts. In other words, Pearson's deemed admissions to Verse's proposed facts will take precedence over any contradictory factual assertions in his deposition testimony.

With that background, the following facts are undisputed except where noted.

Pearson was booked into the La Crosse County Jail as a pretrial detainee in June 2021. He's since been convicted and was transferred to the custody of the Wisconsin Department of Corrections in April 2023. Verse is a captain and oversees jail operations.

Pearson's claims concern two topics: the conditions of disciplinary confinement and his religious diet.

**Conditions of disciplinary confinement.** On May 10, 2022, Pearson was placed in disciplinary confinement for failure to obey direct orders, resisting jail staff, threatening

another inmate, disrupting jail operations, and creating a disturbance. Pearson waived his right to a formal disciplinary hearing regarding those actions and other violations that occurred shortly after he entered disciplinary confinement. Pearson received 70 days of disciplinary confinement.

While in disciplinary confinement, Pearson disrupted jail operations and damaged property by covering his cell camera and damaging a sprinkler. Pearson also received several incident reports for other conduct including throwing feces from his cell and threatening jail staff. *See* Dkt. 56-3 at 27, 31, 33, 39, 43, 48. He concedes the disruption of jail operation and the damage to property, but he disputes the other conduct. Because of Pearson's actions and jail staff's findings that he violated numerous jail rules during his disciplinary confinement, he received additional time there. Pearson left disciplinary confinement on July 25, 2022. Shortly after, he was transferred to Mendota Mental Health Institute for about six weeks, returning to the jail in September 2022.

Pearson's claims concern the conditions in disciplinary confinement. During the confinement, he was housed primarily in medical cells 1 and 6, though he was placed in padded cells for a few days based on his request or safety concerns. The medical cells measure 12'2" by 11'7", which is larger than the cells in general population, and have showers. Pearson did not share cells with other prisoners.

Jail policy governing disciplinary confinement provides that prisoners must receive at least three hours of exercise a week outside their cells, but exceptions are allowed for legitimate security reasons. The entire time Pearson was in disciplinary confinement, Verse determined that letting him out of his cell to exercise posed too great a security risk considering his alleged threats, disruption to jail operations, and other conduct.

When a prisoner is removed from a disciplinary confinement cell, jail staff sprays the cell with disinfectant. When Pearson entered disciplinary confinement, he received a clean mattress and clean thermal blanket. Prisoners in disciplinary confinement receive new blankets every 30 days and they can request new blankets and mattresses before then. Pearson filed several grievances asking for a bedsheet, but jail staff denied them. Prisoners in disciplinary confinement do not receive bedsheets because of penological concerns (e.g., using the sheets to harm themselves, damage property, or flood the cell).

**Religious diet.** About ten months into his incarceration at the jail, Pearson asked for a Rastafarian diet, which he contended required him to eat unprocessed, natural foods. The jail had had no previous requests for a Rastafarian diet. Jail chaplain Ann Wales purchased books on Rastafarianism so that Pearson could learn about Rastafarian beliefs and diet. She approved his request, and Pearson signed a religious diet accommodation request form for a lacto/ovo vegetarian diet in February 2022. Dkt. 56-7 at 1. About a month and a half later, in April 2022, Pearson signed a new form that specified a "Rastafarian—non-processed food" diet. *Id*. at 3. Verse supported the request and communicated it to Aramark, the company under contract to provide food to the jail. Pearson repeatedly complained that his religious diet wasn't being met because it contained processed foods. Verse responded to many of Pearson's grievances, described some of the efforts he was taking to address Pearson's concerns, and often apologized for shortcomings in his religious diet. Verse directed jail staff and sergeants to ensure that Pearson was provided with this religious diet. Pearson agrees that:

> Verse made repeated and extensive efforts to ensure that Pearson was receiving adequate levels of nutrition on his Rastafarian diet, including repeated contact with Aramark dieticians and staff members to ensure Pearson was provided a variety of options that met his nutritional needs, while still complying with his religious diet.

4

Dkt. 69 ¶ 95.

I will discuss additional facts as they become relevant to the analysis.

ANALYSIS

A. **Due process claims**

   1. **Conditions in medical cell**

   Pearson asserts a due process claim based on the allegation that, when he filed the complaint, he had spent 70 days in a disciplinary confinement cell that had an uncovered, unclean mattress, and that he couldn't leave to exercise.

   As a pretrial detainee, Pearson's due process claim is governed by the standards of the Fourteenth Amendment. To prevail, Pearson must show that: (1) Verse acted intentionally, knowingly, or recklessly when he considered the consequences of his actions; and (2) Verse's actions were objectively unreasonable. *See McCann v. Ogle Cnty., Ill.*, 909 F.3d 881, 886 (7th Cir. 2018); *see also Hardeman v. Curran*, 933 F.3d 816, 823 (7th Cir. 2019). The first element ensures that due process claims are not based on simple mistakes; it's not disputed here. The second element is at issue. When evaluating whether challenged conduct is objectively unreasonable, "courts must focus on the totality of facts and circumstances." *Mays v. Dart*, 974 F.3d 810, 819 (7th Cir. 2020).

   Verse would not let Pearson leave his disciplinary confinement cell to exercise based on the determination that he posed too great a security risk in view of his alleged threats, disruption to jail operations, and other misconduct. Pearson concedes that he committed at least some of this misconduct, including some of the disciplinary violations that led to his confinement, and covering his camera and damaging a sprinkler while confined. Even though

5

Pearson disputes that he committed some of the other violations (throwing feces and threatening jail staff), he nevertheless received the conduct reports. He hasn't shown that Verse had any reason to believe that they were false. Accordingly, the evidence shows that Verse had an objectively reasonable basis to conclude that releasing Pearson from disciplinary confinement posed an unacceptably high risk to jail security. Pearson cites no factually supported basis to infer that Verse declined to let Pearson exercise outside his cell out of animus or to punish him.

And Verse's determination didn't stop Pearson from exercising. The entire time Pearson was in disciplinary confinement, he had enough room to engage in various forms of physical activity, including burpees, push-ups, jumping jacks, and core exercises. *See* Dkt. 55 (Pearson Dep., 84:19–85:14). Pearson's cell was larger than the cells in general population and he could exercise whenever he wanted. *Id.* (39:20–40:4, 40:11–13, 87:2–9); *cf. Thomas v. Ramos*, 130 F.3d 754, 764 (7th Cir. 1997) (rejecting inmate's Eighth Amendment challenge based on lack of outdoor exercise for the 70 days he was confined, in part because he could do push-ups, sit-ups, step-ups, and jog in place). Because Verse had legitimate reasons to believe that Pearson would jeopardize security if he let him out of his cell to exercise, and because Pearson could still exercise in his cell, Pearson cannot show that the lack of out-of-cell exercise for approximately two and half months violated his due process rights. *Cf. Martin v. Tyson*, 845 F.2d 1451, 1454, 1456 (7th Cir. 1988) (denying pretrial detainee outdoor exercise for nearly four months did not violate due process because the detainee posed a flight risk).

Pearson had no absolute right to outdoor exercise (or even out-of-cell exercise). *See id.* at 1454.[1] The cases that have found Eighth or Fourteenth Amendment violations for a

---

[1] *See also Winger v. Pierce*, 521 F. App'x 569, 574 (7th Cir. 2013) (rejecting contention that

deprivation of exercise involve much more serious deprivations than Pearson faced. *See James v. Pfister*, 708 F. App'x 876, 879 (7th Cir. 2017) (prisoner housed with another prisoner in cramped cell for a year); *Turley v. Rednour*, 729 F.3d 645, 652–53 (7th Cir. 2013) (two prisoners often kept in 40-square-foot cells with hardly any empty floor space for 21-month period); *Delaney v. DeTella*, 256 F.3d 679, 684 (7th Cir. 2001) (prisoner housed in phone booth-sized cell for six months); *Antonelli v. Sheahan*, 81 F.3d 1422, 1432 (7th Cir. 1996) (prisoner housed in area the size of a small house trailer with at least 37 other prisoners).

Pearson contends that he was segregated for periods other than May 10, 2022, to July 25, 2022, but he didn't challenge those separate stays in his complaint. *See Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012) ("[A] plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment."). If Pearson asked now to amend his complaint to add these claims, I would deny the request because it comes far too late.

Pearson also faults Verse for not giving him a bedsheet based on concerns that his "raw" mattress could absorb "body sweat or gases." *See* Dkt. 1 at 3. The jail's policy prohibits bedsheets for segregated prisoners for penological purposes, including preventing self-harm and property damage. Pearson had engaged in some of that type of conduct while in segregation (i.e., covering his cell camera and damaging a sprinkler). It was reasonable for Verse to conclude

---

"prolonged deprivation of out-of-cell exercise is per se unconstitutional," and noting that "in-cell exercise may serve as an alternative to out-of-cell exercise"); *Pearson v. Ramos*, 237 F.3d 881, 884 (7th Cir. 2001) ("We think it a reasonable rule that a denial of yard privileges for no more than 90 days at a stretch is not cruel and unusual punishment."); *Barnes v. Ramos*, 2 F. App'x 507, 509–10 (7th Cir. 2001) (suspension of out-of-cell exercise privileges for 90 days didn't violate Constitution).

that giving Pearson a bedsheet would disrupt jail operations and potentially endanger Pearson himself.

Pearson hasn't shown that the lack of a bedsheet exposed him to unsanitary conditions. Pearson's mattress was disinfected before he entered the cell, at which point he received a clean mattress and thermal blanket. Pearson also received a new blanket every month and could have requested a new blanket or mattress at any time. Pearson left the medical cells to stay in padded cells a few times, and the evidence shows that the medical cells were disinfected before he re-entered them. Pearson may have feared that his mattress was absorbing sweat and gases, but he cites no evidence that he was exposed to unsanitary conditions likely to harm him, or that he actually suffered any physical harm from sleeping on an uncovered mattress.

### 2. Length of disciplinary confinement

Pearson suggests that the sheer length of his disciplinary confinement violated due process. Pearson hasn't shown that the conditions of his segregation were unusually harsh, and disciplinary confinement for two-and-a-half months is not long enough to violate an inmate's due process rights. *See Carr v. Fuchs*, No. 22-cv-603-jdp, 2023 WL 3224203, at *1 (W.D. Wis. May 3, 2023). Pearson contends that his segregation violated Wis. Stat. § 302.40, which states that, "[f]or violating rules of the jail, an inmate may be kept in solitary confinement . . . not over 10 days." But a state-law violation is not itself a constitutional due process violation. *See Vargas v. Cook Cnty. Sheriff's Merit Bd.*, 952 F.3d 871, 874 (7th Cir. 2020) ("[A] state's failure to comply with its own law is not a federal due-process violation."); *Pulera v. Sarzant*, 966 F.3d 540, 551 (7th Cir. 2020) ("[A] violation of a jail policy is not a constitutional violation enforceable under 42 U.S.C. § 1983.").

8

3. **Adequacy of nutrition**

Pearson contends that his diet was nutritionally deficient because he wasn't receiving enough protein and vitamins, and because he's allergic to peanut butter.

Prisons and jails must provide "nutritionally adequate food." *Antonelli*, 81 F.3d at 1432. To prevail, Pearson must show that Verse's efforts to ensure that he received nutritionally adequate food were objectively unreasonable. *Cf. Hardeman*, 933 F.3d at 823. Preparing a prisoner's diet in accordance with nutritional guidelines set by a dietician supports the diet's nutritional adequacy. *Cf. Lunsford v. Bennett*, 17 F.3d 1574, 1580 (7th Cir. 1994). It's undisputed that a dietician must approve the jail's menus must before they're served, and that Verse "repeatedly contacted Aramark, the food service manager at the Jail, and the kitchen staff to . . . ensure that [Pearson's] . . . nutritional dietary needs were being met." Dkt. 56 ¶ 31.

Pearson has no evidence that his jail diet was nutritionally deficient. Pearson contends that he lost seven to eight pounds during the first year and a half he was at the jail. Dkt. 55 (Pearson Dep. 126:15). But modest weight loss alone doesn't suggest that his food was nutritionally deficient. *See Godfrey v. Spiller*, No. 15-cv-455, 2018 WL 1706371, at *3 (S.D. Ill. Apr. 9, 2018) ("Plaintiff's allegations of hunger pains and approximately twenty pounds of weight loss over the course of a year without any adverse health effects are not significant enough to show objectively serious harm."). Pearson's diet included hardboiled eggs, fruit, oranges, processed carrots, cereal, beans (perhaps both natural and processed), frozen vegetables, potatoes, bread, and peanut butter. *Id.* (120:7–8, 121:11, 124:17–18, 129:3–5); Dkt. 56-10 at 5, 10. Pearson adduces no evidence that he was deficient in any vitamin, and he received multivitamins from medical staff upon request. *See* Dkt. 55 (Pearson Dep. 126:2–6,

9

135:11–23). Pearson states that he's allergic to peanut butter and that consuming it caused him to get sores inside his mouth. *Id.* (127:15–23, 129:12–14). But Pearson received other foods, including protein sources like eggs and beans. There's no evidence that Pearson was deficient in protein.

If there were any shortcomings in Pearson's diet, they weren't Verse's fault. As noted above, Pearson concedes that "Verse made repeated and extensive efforts to ensure that Pearson was receiving adequate levels of nutrition."

**B. Religious liberty claims**

Pearson alleges that his diet included processed foods, which interfered with his religious practice as a Rastafarian, which requires him to eat only natural foods. I allowed Pearson to proceed on claims under the First Amendment and RLUIPA.

I begin with a preliminary issue pertinent to both the First Amendment and RLUIPA claims: whether Pearson's dietary request was rooted in a sincere religious belief.

Verse adduces evidence that Pearson's professed commitment to a Rastafarian diet is insincere. He asked for the Rastafarian diet after he had been at the jail for months. He acquired and ate processed foods after committing to the Rastafarian diet. He described Rastafarianism as a "lifestyle" rather than a religion. But Pearson clarifies in his response to Verse's proposed findings of fact that Rastafarianism is a "religion which is [a part] of [his] lifestyle." Dkt. 63 ¶ 1. And occasional backsliding does not necessarily rebut the sincerity a religious belief. *See Reed v. Faulkner*, 842 F.2d 960, 963 (7th Cir. 1988) ("[T]he fact that a person does not adhere steadfastly to every tenet of his faith does not mark him as insincere."). The point is genuinely disputed, but for purposes of summary judgment, I'll accept that Pearson's interest in a Rastafarian diet is rooted in a sincere religious belief.

10

### 1. First Amendment free-exercise claim

To prevail on a claim under the Free Exercise Clause, Pearson must show that Verse "personally and unjustifiably placed a substantial burden on his religious practices." *See Thompson v. Holm*, 809 F.3d 376, 379 (7th Cir. 2016). A "prisoner's religious dietary practice is substantially burdened when the prison forces him to choose between his religious practice and adequate nutrition." *Id*. at 381. Under the First Amendment, a burden is justified if it's "reasonably related to a legitimate penological interest." *See id.*

The parties agree that a Rastafarian diet requires its adherents to avoid processed foods and eat "natural" foods. But Pearson hasn't clearly spelled out what this means. He says in his deposition that a Rastafarian diet requires him to eat natural foods (e.g., fruit, vegetables, and fish and chicken in moderation), and to forgo processed foods. Dkt. 55 (103:19–104:1). He testified that "Doritos, peanut butter cookies, chocolate cupcakes, Fritos, ramen" would all be banned processed foods. *Id*. (139:6–14). At times, his view of a proper diet was extremely strict: vegetables had to be "straight out of the garden," and not canned, frozen or "processed through a machine." *Id*. (137:2–14). Other times, he suggested that Rastafarians could eat processed foods in moderation. Dkt. 69 ¶ 56. And he has not criticized the Rastafarian menu grid prepared by Verse to instruct Aramark. Dkt. 56-19. That grid includes bread, peanut butter, margarine, and frozen vegetables. For purposes of summary judgment in this case, I don't need to determine precisely which foods would be allowed. I'll assume that processed foods are forbidden, and that sometimes processed foods were given to Pearson.

This leads to the next issue, whether Pearson's religious diet was substantially burdened. Pearson says in his deposition that his diet was 65 percent processed food. Dkt. 55 (124:13). Without a good definition of "processed," it's hard to credit that statement as anything more

11

than merely conclusory. But there's evidence that: (1) Pearson repeatedly complained to Verse that he was receiving processed foods; and (2) Verse repeatedly raised his concerns with dieticians and kitchen staff, at times directing staff not to serve him processed foods. *See* Dkt. 56-10 at 1–3, 5–6, 8; Dkt. 56 ¶¶ 29, 37; Dkt. 56-12. Viewing the evidence in Pearson's favor, as I must at this stage, it's reasonable to infer that a meaningful part of Pearson's diet consisted of processed foods. Pearson could have stopped eating processed foods outright, but I'll infer that forgoing the processed part of his diet would have compromised his health. *See Thompson*, 809 F.3d at 380 ("We have repeatedly held that forcing an inmate to choose between daily nutrition and religious practice is a substantial burden."). I will accept for purposes of summary judgment that Pearson got enough processed foods to substantially burden Pearson's religious practice. *See Njie v. Dorethy*, 766 F. App'x 387, 392 (7th Cir. 2019).

Verse contends that he was not the one who burdened Pearson's religious practice. *See* Dkt. 57 at 21–24. In the circumstances of this case, this issue turns on whether Verse had the power to ensure that Pearson received a diet of primarily natural foods. A defendant cannot be liable under 42 U.S.C. § 1983 "if the remedial step was not within their power." *Miller v. Harbaugh*, 698 F.3d 956, 962 (7th Cir. 2012). Pearson concedes that Verse took "repeated and extensive efforts" to ensure that he got adequate nutrition within the strictures of a Rastafarian diet. The evidence shows that Verse embraced Pearson's request for a Rastafarian diet, and that he did what he could to get Aramark to provide it.

Policy 900, which governs the jail food services, supports Verse's position. Under this policy, the food services manager (Aramark) is responsible for: (1) managing a budget for food services; and (2) developing a menu plan that meets all nutritional requirements and that can be produced within the available budget. Dkt. 56-6 at 1. A registered dietician must approve

12

menus before they are served. *Id.* The policy further provides that: (1) Aramark will provide religious diets to the extent reasonably practicable; and (2) the religious diets must conform to the nutritional and caloric requirements for non-religious diets. *See id.* at 2–3. So, facially at least, the policy provides that Aramark, not Verse, was responsible for meeting Pearson's religious dietary needs. The policy states that Verse, as the jail's captain, could assign other duties to Aramark. *See id.* at 1. But that general provision, by itself, doesn't suggest that Verse specifically could order Aramark to provide Pearson with a diet of primarily natural foods.

It's undisputed that Verse "became personally involved in reviewing Pearson's grievances and general inmate requests related to his Rastafarian diet." Dkt. 56 at 21. These efforts included corresponding with Aramark management and kitchen staff to ensure that Pearson's diet was accommodated. *See id.* But Verse's emails with Aramark managerial staff and dieticians don't suggest that he could have ordered them to overhaul Pearson's diet; Verse was simply relaying Pearsons's concerns to them and asking them if they could do something to address those concerns. *See* Dkt. 56-12. A few times, Verse criticized kitchen staff for giving Pearson the wrong items. *See* Dkt. 56-10 at 1–3, 6. But kitchen staff, not Verse, committed those mistakes. Pearson hasn't explained what else Verse could have done to ensure that kitchen staff gave him the correct items. Furthermore, Pearson hasn't argued, much less shown, that kitchen staff had enough natural foods to give him trays that contained only natural foods.

Pearson says in his deposition that the jail had enough money to buy more natural foods, and that Jewish, Muslim, and other prisoners received religious diets. Dkt. 55 (108:21–25, 137:18–25). Pearson has no foundation for his testimony about the funds available to Aramark. And the issue is whether Verse could have authorized Aramark to buy more natural foods and serve Pearson a diet primarily consisting of them. The policy provides

that Aramark is responsible for managing the food services budget and developing a menu within that budget.

Verse's communications with Aramark management support this reading of the policy. In one email, Megan Brownie, Aramark's food service director, tells Verse that Aramark management would "definitely have to address [a proposed religious diet] before [] commit[ing] to something long term . . . from a cost perspective as well as precedent and potential fall[out] from others." Dkt. 56-12 at 13. In short, the evidence shows that Verse did not control the jail's budget for food services. *See also Ozaukee Cnty. v. Lab. Ass'n of Wis.*, 2008 WI App 174, ¶ 25 ("[T]he county . . . is solely responsible for the costs of operating and maintaining the county jail."); *Aleman v. Milwaukee Cnty.*, 35 F. Supp. 2d 710, 721 (E.D. Wis. 1999) (same). And, even if Verse could have directed Aramark to acquire more natural foods, there's no basis to infer that he could have compelled them to provide Pearson's preferred diet, particularly a strict version requiring that all vegetables had to be straight from the garden.

In sum, Pearson concedes that Verse made repeated and extensive efforts to provide Pearson with a proper Rastafarian diet. And the evidence shows that Verse lacked the power to do any more to ensure that Pearson received a diet consisting primarily in natural foods. I will grant summary judgment to Verse on Pearson's First Amendment claim.

### 2. RLUIPA claim

The essential principle of RLUIPA, as it applies to prisoners and detainees, is simple: any substantial burden on a prisoner's religious exercise is subject to review akin to strict constitutional scrutiny. Thus, RLUIPA affords greater substantive protection of religious practices than does the Free Exercise Clause of the First Amendment.

But RLUIPA remedies against an individual government official are limited to declaratory and injunctive relief. *See Vinning-El v. Evans*, 657 F.3d 591, 592 (7th Cir. 2011) ("RLUIPA does not authorize any kind of relief against public employees . . . ."); *see also Stewart v. Beach*, 701 F.3d 1322, 1335 (10th Cir. 2012) ("[T]here is no cause of action under RLUIPA for individual-capacity claims.").

I've explained above why Verse is not personally responsible for imposing any burden on Person's religious practice, so Pearson is not entitled to declaratory relief against Verse. And any claim for injunctive relief is moot, because Pearson is no longer incarcerated at the jail. *See Lehn v. Holmes*, 364 F.3d 862, 871 (7th Cir. 2004); *Higgason v. Farley*, 83 F.3d 807, 811 (7th Cir. 1996). Pearson hasn't contended that there's a "realistic possibility" that that he could return to the jail, and he professes no interest in returning to La Crosse. *See* Dkt. 55 (Pearson Dep. 15:12–17:2); *see also Maddox v. Love*, 655 F.3d 709, 716 (7th Cir. 2011).

That leaves a potential official-capacity claim under RLUIPA. Although it's an open question, I have concluded that current law allows RLUIPA claims for damages against county officials acting in their official capacity. *Russell v. Lange et al.*, 22-cv-333-jdp (W.D. Wis. Jan. 11, 2023), Dkt. 14 at 7. An official-capacity claim is effectively one against the county itself, and such a claim would have to be based on an official county policy, a practice so widespread that it has the effect of official policy, or proof that a county employee with final policymaking authority inflicted the deprivation of federal rights. *Est. of Sims ex rel. Sims v. Cnty. of Bureau*, 506 F.3d 509, 515 (7th Cir. 2007).

No evidence would support such a claim here. The official policy of the La Crosse County Jail provides that an inmate may request a diet that accommodates religious restrictions. The policy is not limited to particular religions. Although the jail had never

15

previously had a request for a Rastafarian diet, chaplain Wales quickly approved Pearson's request. And Verse did what he could to get jail staff and the food service provider to respect Pearson's dietary requests. The problems that Pearson encountered, though numerous, were isolated ones that Verse tried to address. None of the problems that Pearson encountered were the result of any official La Crosse County policy or widespread county practice. And, even if I considered Verse to be the final policymaking authority for La Crosse County with respect to religious dietary matters, he wasn't responsible for the alleged substantial burden that the jail's diet placed on Pearson's religious practice.

ORDER

IT IS ORDERED that:

1. Defendant Captain Jim Verse's motion for summary judgment, Dkt. 52, is GRANTED.

2. The clerk of court is directed to enter judgment and send plaintiff David Anthony Pearson, Jr. copies of this order and the judgment.

Entered February 9, 2024.

BY THE COURT:

/s/
_____
JAMES D. PETERSON
District Judge